UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

W. CHRISTOPHER BEARY                                    CIVIL ACTION

VERSUS                                                 NO. 16-15757

DAVID DEESE, et al.                                    SECTION A(5)

<u>**ORDER AND REASONS**</u>

Before the Court are several motions filed in anticipation of trial by Plaintiff W. Christopher
Beary ("Beary"), and by Defendants: David W. Deese ("Deese"), Quinco Electrical, Inc., Quinco
Electrical of Dallas, Inc., Quinco Electrical of Georgia, Inc., Quinco Electrical of North Carolina, Inc.,
and Quinco Services, Inc. (collectively referred to as the "Quinco Companies"). The motions are now
before the Court on the briefs without oral argument. This matter is set as a bench trial beginning on
July 9, 2018 at 8:30 a.m. Having considered the motions and memoranda of counsel, the record, and
the applicable law, the Court finds that Plaintiff's **Motion to Dismiss Counterclaim (Rec. Doc. 60)** is
**GRANTED** for the reasons set forth below; the Court finds that Defendants' **Motion for Partial
Summary Judgment (Rec. Doc. 67)** is **GRANTED in part** and **DENIED in part** for the reasons set
forth below; the Court finds that Defendants' **Motion to Disqualify Jeffrey L. Oakes (Rec. Doc. 68)**
is **GRANTED** for the reasons set forth below; and the Court finds that Defendants' **Motion for Partial
Summary Judgment on Plaintiff's Claims Under the Florida Deceptive and Unfair Trade
Practices Act (Rec. Doc. 70)** is **GRANTED** for the reasons set forth below. Following a general
review of the factual and procedural background, the Court will address and rule on each motion in
turn below.

I.      **Background**[1]

---

[1] The following factual background is, in large part, adopted from the Court's previous Order and Reasons (Rec. Doc. 39)
that addressed Defendants' previous Motion for Summary Judgment. (Rec. Doc. 20).

Defendant David W. Deese is domiciled and resides in Orlando, Florida. (Rec. Doc. 1, p. 2). He is the sole shareholder, president, and chairman of the board of Quinco Electrical, Inc., Quinco Electrical of Dallas, Inc., Quinco Electrical of Georgia, Inc., Quinco Electrical of North Carolina, Inc., and Quinco Services, Inc. The Quinco Companies are in the business of electrical contracting with operations being directed from Quinco Electrical Inc.'s facility in Winter Park, Florida.

Plaintiff is a citizen of Louisiana. Plaintiff alleges that, around the start of 2016, he learned Deese was offering to sell the Quinco Companies. The parties then negotiated for several months. On June 2, 2016, Deese signed a Letter of Intent ("June 2 LOI") setting forth the terms concerning the sale of the Quinco Companies' assets to Plaintiff.[2] Defendants contend that the June 2 LOI superseded all prior written agreements between the parties and is the only effective written agreement pertaining to the sale of the Quinco Companies' assets. (Rec. Doc. 20-1, p. 3). Among other provisions, the June 2 LOI provided that the buyer would pay to seller's counsel, to be held in trust, a deposit of $30,000. *Id.* The June 2 LOI also provided for a Due Diligence Period. During this period, Plaintiff could elect not to proceed with the sale. Upon such a decision by Plaintiff, the $30,000 deposit would be refunded. (Rec. Doc. 20-1, p. 5). The Due Diligence clause also stated that Defendants and Defendants' employees "shall fully cooperate with [Plaintiff] and its agents during the Due Diligence Period and shall grant full access to the Property, all leased locations, and each Seller's contracts, books and records." (Rec. Doc. 20-8, p. 2). The June 2 LOI also contains a Good Faith clause whereby the parties were to negotiate the Closing Documents in good faith. *Id.* Finally, the June 2 LOI contains an "Entire Agreement" clause, which provides:

> Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto and supersedes any and all prior negotiations and agreements, implied or expressed, and oral or written in respect to the subject matter hereof unless such prior written agreements are expressly referred to herein but only to the extent of such

---

[2] The June 2, 2016 Letter of Intent is referred to as the "First Amended LOI" by the Plaintiff. It is referred to as the "Amended LOI" by the Defendants. For the sake of consistency, the Court will refer to the Letter of Intent signed by the Defendant on June 2, 2016 as the "June 2 LOI."

reference. This Agreement may only be amended by written instrument executed by Buyer and Sellers. *Id.*

Plaintiff disagrees with Defendants' contention that the June 2 LOI is the only effective agreement between the parties. Plaintiff argues that the June 2 LOI was amended on July 20, 2016.[3] On July 18, 2016, Plaintiff informed Deese that the Plaintiff's bank, FNBC, would not be able to finance Plaintiff's purchase of the Quinco Companies under the terms of the June 2 LOI. (Rec. Doc. 23, p. 4). Plaintiff proposed new terms to Deese on July 19, 2016. Later that day, Deese countered with terms on which he was willing to proceed with the transaction. *Id.* The two parties went back and forth until Deese's counsel, Trevor Brewer ("Brewer"), sent Plaintiff a reply email that expressed Deese's counter to Plaintiff's new terms.[4] *Id.* at p. 5. The email also stated, "Since David [Deese]'s willing to give on all other areas, he'd like you to meet him on this one." *Id.* In response, Plaintiff wrote, "I agree, I will tell the bank and advise." *Id.* at 6.

Thereafter, from around July 26, 2016 to August 12, 2016, the parties continued negotiations, but were unable to agree on final terms. Plaintiff maintains that Deese would orally agree to new terms then refuse to sign any amended LOI evidencing the new terms. Plaintiff identifies these refusals as six different "Repudiation of Agreed Terms." (Rec. Doc. 23, pp. 7-12). On the other hand, Defendants maintain that these proposed amendments were not executed by Deese or Deese's counsel and therefore expired on their own terms. (Rec. Doc. 20-1, p. 6). Plaintiff also alleges Deese and his employees purposefully failed to comply with numerous due diligence requests in accordance with the "Due Diligence" provision of the June 2 LOI.[5]

---

[3] Defendants do not acknowledge the July 20, 2016 amendments to the June 2 LOI. Plaintiff refers to the amendments allegedly agreed upon on July 20, 2016 as the "Second Amendment." For the sake of consistency, the Court will refer to the Letter of Intent with the alleged amendments occurring on July 20, 2016 as the "July 20 LOI."

[4] Plaintiff alleges that during the course of the July 19-20, 2016 negotiations, Deese was playing in a baseball tournament in the Dominican Republic. (Rec. Doc. 23, p. 5). Therefore, Brewer was allegedly communicating on behalf of Deese. The nature of Deese's and Brewer's relationship with one another and whether Brewer had the ability to bind Deese is relevant to this matter, but not addressed by the Court at this time.

[5] Neither the "Good Faith Negotiation" provision nor the "Due Diligence" provision were impacted by the alleged July 20, 2016 amendments. However, the parties seem to agree that a text message exchange between Plaintiff and Deese amended the Due Diligence Period by extending it from August 10, 2016 to August 31, 2016.

On August 12, 2016, Plaintiff's counsel, Jeffrey Oakes ("Oakes"), sent Brewer a letter stating that Defendants were being placed in default. Plaintiff contends that Defendants failed to cooperate with Plaintiff's due diligence requests and were therefore in breach of the July 20 LOI. (Rec. Doc. 23, pp. 12-16). Soon thereafter, Plaintiff directed Oakes to terminate the agreement and to not proceed with the purchase of the Quinco Companies.

On October 21, 2016, Plaintiff filed suit against Defendants claiming breach of contract for failing to cooperate with due diligence requests, failing to negotiate the closing documents in good faith as required by the July 20 LOI, and for repudiating the July 20 LOI. Plaintiff also alleges claims for fraud and violation of the Florida Deceptive and Unfair Trade Practices Act. (Rec. Doc. 1).

## II.      Jurisdiction

This Court has subject matter jurisdiction of this civil action pursuant to 28 U.S.C. § 1332. The Plaintiff is a citizen of Louisiana. The Defendants are citizens of Florida, Georgia, North Carolina, and Texas. The Court finds that the amount in controversy exceeds $75,000.


## III.      Plaintiff's Motion to Dismiss Counterclaim (Rec. Doc. 60)

Before the Court is Plaintiff's motion seeking to dismiss Defendants' counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6). The crux of this motion requires the Court to make a conflict of law determination in deciding whether Florida or Louisiana law applies to the recorded telephone conversations more thoroughly described below.

### A.  Background

In their Answer to Plaintiff's Third Amended Complaint, Defendants included a counterclaim for violation of Florida's Security of Communications Act, Fla. Stat. § 934.01 *et seq.* (Rec. Doc. 57, p. 25–26). According to the allegations within the counterclaim, Plaintiff called Deese's cell phone on

August 12, 2016. *Id.* at ¶ 21.[6] Deese's assistant, Emily Wood, answered the call and Plaintiff asked Wood to have Deese call him back when available. Shortly thereafter, Deese returned Plaintiff's call on his cell phone, and the two discussed the terms of the sale of the Quinco Companies and certain due diligence requests. Plaintiff recorded both conversations, the call between Plaintiff and Wood, and the call between Plaintiff and Deese, without the consent or knowledge of Wood or Deese. *Id.* at ¶¶ 21, 23. On September 19, 2017, Plaintiff's counsel submitted a copy of the recorded conversations to the Court for in camera inspection seeking to use the conversations as potential impeachment materials.[7] Upon reviewing the conversations, the Court had Plaintiff disclose the recordings to Defendants and Defense counsel. Thereafter, Defendants brought a counterclaim seeking damages pursuant to Florida's Security of Communications Act, Fla. Stat. § 934.10, stemming from the telephone conversations being recorded without the knowledge or consent of Woods or Deese.

### B. Legal Standard

Under well-settled standards governing Rule 12(b)(6) motions to dismiss, a claim may not be dismissed unless it appears certain that the plaintiff cannot prove any set of facts that would entitle him to legal relief. *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 251 (5th Cir. 2006) (citing *Benton v. United States*, 960 F.2d 19 (5th Cir. 1992)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand*

---

[6] Deese is a resident of Florida and was a resident of Florida at the time of the call. His cell phone has a Florida area code. Deese and his phone were located in Florida during the calls.

[7] The Court's Pre-Trial Notice allows parties to submit potential impeachment exhibits for in camera inspection without prior disclosure to the opposing party. (Rec. Doc. 19-1, p. 6) (Pre-Trial Notice, Paragraph IX, Rule 10(b)).

*v. US Unwired, Inc.,* 565 F.3d 228, 239 (5th Cir. 2009).  But the Court is not bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

A legally sufficient complaint need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Id.*  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.  *Lormand*, 565 F.3d at 257.  If there are insufficient factual allegations to raise a right to relief above the speculation level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed.  *Twombly*, 550 U.S. at 555.

### C.  Law and Analysis

The instant issue is straightforward.  Florida state law requires that all parties to a conversation consent before the conversation can be recorded.  Louisiana state law only requires one party's consent to recordation before a conversation can be legally recorded.  The Court is tasked with making the legal determination of whether Florida state law or Louisiana state law applies to the recorded conversations at issue.  If Florida law applies, Defendants have sufficiently alleged a cause of action under the Florida Security of Communications Act because Defendants allege that only Plaintiff consented to the conversations at issue being recorded.[8]  If Louisiana law applies, Defendants have failed to sufficiently allege a cause of action under Louisiana Revised Statute § 15:1303(c)(4) because Plaintiff was a party to the recorded conversations.[9]  Putting the issue in its simplest terms, Louisiana law does not afford Defendants a cause of action under the alleged facts.  Florida law does.

---

[8] The Florida Security of Communications Act prohibits a party to a conversation from recording the conversation without the consent of all the parties to the conversation, provided the conversation is not public and that the intercept is not conducted for the purposes of obtaining evidence of a criminal act as provided in the Act.  Fla. Stat. §§ 47:934.02, 934.02(2), 934.03(2)(c,d); *see State v. News-Press Pub. Co.*, 338 So.2d 1313, 1315 (Fla. 2d Dist. Ct. App. 1976).  Moreover, Florida Statute § 47:934.10 creates a private right of action for violations of §§ 47:934.03-934.09.

[9] Louisiana Revised Statute § 15:1303(c)(4) provides, in relevant part: "It shall not be unlawful . . . for a person . . . to intercept a wire, electronic, or oral communication where such a person is a party to the communication or where one of the parties to the communication has given prior consent to such interception. . . ." La. R.S. § 15:1303(c)(4).

Determining whether Louisiana or Florida law applies requires this Court to conduct a conflict-of-laws analysis. Federal courts sitting in diversity apply the conflict-of-laws of the forum state to identify the substantive law that applies. *McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 542 (5th Cir. 2012). Because this Court currently sits in diversity and the forum is Louisiana, the Court must turn to Louisiana's conflict-of-laws rules.

Book IV of Louisiana's Civil Code is the appropriate starting point for making a conflict-of-laws determination under Louisiana law. Louisiana's general conflict of law analysis is codified in Louisiana Civil Code article 3515. Article 3515 provides, in relevant part, that "Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." La. Civ. Code art. 3515. The article further provides two factors that courts must consider:

(1) The relationship of each state to the parties and the dispute, and

(2) The policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

*Id.*; *see also Cohen v. Becker*, No. 17-935, 2018 WL 782955, at *4 (E.D. La. Feb. 8, 2018). However, article 3515 acts as the general or residual rule when Book IV fails to provide for a more specific circumstance. The Court agrees with both parties in finding that the applicable provision for the situation at bar is article 3543 found in Title VII—"Delictual and Quasi-Delictual Obligations"—of Book IV. Article 3543 deals with situations wherein standards of conduct and safety are at issue. La. Civ. Code art. 3543 cmt. a. Article 3543 is broken into three paragraphs, each providing different rules for different scenarios, providing:

**Art. 3543. Issues of conduct and safety**

Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.

> In all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state.
>
> The preceding paragraph does not apply to cases in which the conduct that caused the injury occurred in this state and was caused by a person who was domiciled in, or had another significant connection with, this state. These cases are governed by the law of this state.

La. Civ. Code art. 3543.

Plaintiff argues that because his recording device was located in Louisiana when the calls at issue were recorded, the state in which the conduct occurred is Louisiana. (Rec. Doc. 60-1, p. 3). Plaintiff further contends that the injury presumably occurred in Florida. Therefore, Plaintiff argues, the first paragraph of the article would lead to the application of Louisiana law. However, because Florida demands a higher standard of conduct—that all parties to a conversation consent to recording, rather than just one—than Louisiana, the first paragraph is inapplicable. *Id.* Plaintiff further argues that the second paragraph would lead to the application of Florida law, but does not apply because of the third paragraph. According to Plaintiff, the third paragraph applies because it states that if the conduct occurred in Louisiana (Plaintiff argues it did), and the injury was caused by a person who was domiciled in this state (Plaintiff was), then the law of this state (Louisiana) applies. Therefore, Plaintiff argues that because paragraph three requires the application of Louisiana law, Defendants have failed to state a claim for relief as Louisiana only requires one party's consent to record a conversation.

Defendants agree that article 3543 applies, but disagree that the conduct in question occurred in Florida. Rather, Defendants contend that Florida law applies under the first paragraph because the conduct and injury at issue both occurred in Florida. (Rec. Doc. 64, p. 4). In support of their position, Defendants cite Florida state law for the proposition that "the act of 'intercepting' a telephone conversation, for purposes of the Security of Communications Act, occurs when the person whose conversation is recorded without his consent speaks his words, not where the speaker's words are recorded or heard." (Rec. Doc. 64, p. 6) (citing *State v. Mozo*, 655 So.2d 1115, 1117 (Fla. 1995)). The

Court agrees with Defendants in finding that Florida law unequivocally holds that under Florida's Wiretap Statute, an improper "interception" occurs "where the words or the communication is uttered, not where it is recorded or heard." *Cohen Brothers, LLC v. ME Corp., S.A.*, 872 So.2d 321, 324 (Fla. 3d Dist. Ct. App. 2004) (citing *Koch v. Kimball*, 710 So.2d 5, 7 (Fla. 2d Dist. Ct. App. 1998)).[10]

It is clear to the Court that the injury here occurred in Florida, where Deese's conversation was recorded without his consent. However, resolution of this issue comes down to where the alleged conduct occurred in this case. Plaintiff contends the conduct should be the location of the recording— in this case, Louisiana. Defendants, on the other hand, argue that under Florida law, "interception" is equivalent to "conduct," and "interception" occurs where the person, whose conversation is recorded without his consent, speaks his words. (Rec. Doc. 64, p. 6).

Defendants' argument is flawed in two aspects. First, Defendants apply Florida law to interpret the term "conduct", as used in La. Civ. Code article 3543, without any explanation as to why Florida law should apply to interpret the term. Secondly, in referencing the jurisprudence surrounding Florida's Security of Communications Act, Defendants argue that Florida's definition of "intercepting" is more akin to "conduct" than "injury." Plaintiff argues the opposite—*i.e.*, that "interception" is more equivalent to "injury" than "conduct."

The comments to article 3543 provide little assistance in defining "conduct" as the word is used in the article. Comment (h) of article 3543 provides some insight into determining where conduct occurs for purposes of applying article 3543. That comment suggests the proper approach for determining the state that the conduct occurred when the conduct may have occurred in more than one state.[11] Comment (h) provides, in relevant part: "Cases in which the injurious conduct occurs in more than one state should be approached under the principles of causation of the law of the forum.

[10] "'Intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

[11] Although neither party has approached this issue with the proposal that conduct may have occurred in more than one state, the Court finds this comment instructive and applicable to the case at hand.

Ordinarily, these principles will make it possible to determine which particular conduct was, legally speaking, the principal cause of the injury." La. Civ. Code art. 3543 cmt. h.

Louisiana courts employ a duty-risk analysis in ordinary negligence actions. The causation element of the duty-risk analysis requires courts to find the cause-in-fact by first applying the "but-for" test. "Defendant's conduct need not be the sole cause of the harm but it must be a necessary antecedent." 12 La. Civ. L. Treatise, Tort Law § 4.6 (2d ed.) (citing *Morris v. Orleans Parish School Bd.*, 553 So.2d 427, 429 (La. 1989)). In other words, if a plaintiff would not have suffered damages, absent the alleged tortfeasor's conduct, he has satisfied the cause-in-fact requirement. *Id.*[12] Upon a finding that the alleged tortfeasor's conduct was a cause-in-fact of the plaintiff's harm, it still must be determined that it was the legal, or proximate cause, as well. *Id.* Legal cause requires one to ask whether any of the damages to the plaintiff should "be ascribed in law to the defendant, and if so, should the defendant be held liable for every kind of damage done to each of plaintiff's interests." *Id.*

Analyzing the conduct issue through the lens of a causation analysis, clearly shows that the conduct in the instant case occurred in Louisiana. First, Deese's conversation would not have been recorded "but-for" Plaintiff's use of a recording device in Louisiana. Therefore, cause-in-fact is satisfied. Secondly, legal cause is satisfied. Clearly, damage to Deese resulted from no other action than that of Plaintiff using a recording device in Louisiana.

In making this determination, the Court finds merit in Plaintiff's argument that, if the recording device malfunctioned when Plaintiff attempted to record the conversation, then there would have been no violation of Florida law because there would have been no recording. Applying the principles of causation to the conduct determination clearly results in Louisiana being the place of "conduct" in accordance with article 3543.

---

[12] "While the term 'substantial factor' has received recognition in the courts of appeal, the 'but-for' test clearly prevails." 12 La. Civ. L. Treatise, Tort Law § 4.6 (2d ed.).

The Court is further convinced that Louisiana is the place of conduct by Plaintiff's reference to *Hanks v. Zenner*, 99-1333, 2000 WL 1281321, at *1 (W.D. La. Jun. 30, 2000).[13] In *Hanks*, the court was tasked with determining where conduct occurred for purposes of article 3543 when the alleged tortfeasor made an allegedly harassing phone call in South Carolina to the plaintiffs, who were in Louisiana at the time of the call. *Id.* at *14. The following excerpt is taken from *Hanks* and explains the court's reasoning:

> Applying Articles 3542 and 3543 to the facts of the instant case, it appears that the substantive law of South Carolina is applicable to the plaintiffs' claim for punitive damages against Collect America. The tortfeasor's injurious conduct occurred in South Carolina, where Billy Melton, a former employee of [defendant], placed the allegedly harassing phone calls to the plaintiffs, who were located in Louisiana, the state where the plaintiffs sustained their injuries. South Carolina is also the state from which the Zenner Law Firm mailed the allegedly harassing notices to the plaintiffs regarding their debt. Thus, the plaintiffs' claim for punitive damages seeks redress for the harm caused by Collect America through its attorney, whose actions were entered in South Carolina.

*Id.* According to *Hanks*, the injurious conduct occurs where the phone call is placed. Although *Hanks* is not binding precedent and the phone-related tort in *Hanks* was harassment rather than a nonconsensual recording, the Court finds the *Hanks* decision persuasive. Here, the call was placed from, and recorded in, Louisiana; thus, the conduct occurred in Louisiana.

Finally, according to article 11 of Louisiana's Civil Code, "[t]he words of law must be given their generally prevailing meaning." La. Civ. Code art. 11. Black's Law Dictionary defines "conduct" as "[p]ersonal behavior, whether by action or inaction, verbal or nonverbal; the manner in which a person behaves; collectively, a person's deeds." *Black's Law Dictionary* (10th ed. 2014). The behavior in this instance was the operation of a recording device. Holding that the conduct, in this case, is where Deese spoke his words would be a stretch of the generally prevailing meaning of conduct, and

---

[13] According to the Westlaw version of this opinion, *Hanks v. Zenner*, No. 99-1333, 2000 WL 1281321, at *1 (W.D. La. Jun. 30, 2000), the Fifth Circuit subsequently reversed this decision. However, the Fifth Circuit's opinion reversing only provides the word "Reversed." Upon reference to the Western District of Louisiana's docket record of *Hanks*, the Court found that the Fifth Circuit did not reverse the Magistrate Judge's decision on the motion to compel (referenced above), but rather reversed a motion for summary judgment. Regardless, the reasoning of the opinion cited above, *Hanks v. Zenner*, No. 99-1333, 2000 WL 1281321, at *1 (W.D. La. Jun. 30, 2000), is sound and persuasive in regards to the analysis of where "conduct" occurred for purposes of article 3543.

therefore, not in compliance with article 11. This Court is unwilling to make such a stretch, and for the reasons provided, finds that the alleged conduct occurred in Louisiana.

Because the Court finds that Louisiana is the place of conduct, the third paragraph of article 3543 applies. The conduct that caused the injury occurred in this state—Louisiana—and was caused by a person domiciled in this state—Plaintiff. Therefore, Defendant's counterclaim is governed by the law of this state. Louisiana's Electronic Surveillance Act generally prohibits the interception and disclosure of wire or oral communications; however, there are exceptions to this general prohibition, such as where one of the parties to the communication consents to its interception. *State v. Favors*, 43 So.3d 253, 09-1034 (La. App. 5 Cir. 6/29/20), *writ denied* 57 So.3d 309, 2010-1761 (La. 2/4/11). Moreover, in *State v. Reeves*, the Louisiana Supreme Court held that when entering into a conversation, a person should realize that any party to the communication may violate the confidence of the communication by disclosing to others. 427 So.2d 403, 416 (La. 1983); *see also* Op. Att'y Gen. 96-183 (1996) ("One-party consent to audio taping of conversation is legal under the applicable Louisiana and federal law, as long as the taping is not done for the purpose of committing any criminal, tortious or other injurious act.").

Therefore, because Deese does not have a cause of action sufficiently alleged in his counterclaim, Plaintiff's **Motion to Dismiss Counterclaim (Rec. Doc. 60)** must be granted. Thus, Defendants' counterclaim for violation of Florida's Security of Communications Act, Fla. Stat. § 934.01 *et seq.*, is dismissed with prejudice. Furthermore, because Defendants' jury demand was brought in conjunction with its now dismissed Counterclaim, the Court notes that this matter will now proceed as a bench trial.

## IV. Defendants' Motion for Partial Summary Judgment (Rec. Doc. 67)[14]

---

[14] Defendants previously filed a motion for summary judgment (Rec. Doc. 20). The Court granted in part and denied in part that motion on October 20, 2018. (Rec. Doc. 39). Defendants' instant motion is based on different arguments and legal theories than those that were presented in the earlier motion for summary judgment.

Defendants bring the next motion seeking to have Plaintiff's breach of contract claim dismissed on summary judgment. (Rec. Doc. 67-1, p. 2). Defendants' argument is summarized best in their preliminary statement, which provides:

> Partial summary judgment should be granted dismissing Plaintiff's breach of contract claims finding that a valid and enforceable contract does not exist. There was no requisite offer and acceptance necessary to form a binding contract because the purported acceptance contained terms not in the original offer. Additionally, or alternatively, the attorney who purportedly accepted plaintiff's offer on behalf of defendants lacked actual or apparent authority to bind the defendants to a contract.

*Id.*

Furthermore, both parties concede that the substantive terms of the agreements in contention "shall be governed and construed under the substantive laws of the State of New York without regard to conflicts of law principles." (Rec. Doc. 20-8, p. 6). Therefore, because the instant dispute addresses the creation and terms of the alleged agreements between the parties, the applicable law is New York state law. *See* (Rec. Doc. 39, p. 6) (providing, "[N]o amendments to either LOI sought to change the choice of law provision. The 'Governing Law; Forum' provision states that any action brought to enforce or interpret the LOI would be governed by New York law and subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Louisiana.").

## A. Background

The facts relevant to the instant motion are as follows:[15] According to Defendants, Deese and Plaintiff first entered into a letter of intent on May 11, 2016, which laid out the basic terms and conditions under which Plaintiff would acquire the assets of the Quinco Companies. (Rec. Doc. 67-1, p. 2). Thereafter, Deese and Plaintiff entered into an amended letter of intent on June 2, 2016 ("June 2 LOI"), which altered the terms of the May 11, 2016 LOI.

---

[15] Plaintiff agrees, with a few exceptions, that Defendants' summary of facts is accurate.

The June 2 LOI increased the purchase price of the Quinco Companies from $20,000,000.00 to $22,500,000.00. The Purchase Price clause of the June 2 LOI provides as follows:

> Purchase Price. In consideration for the Property, Buyer agrees to pay Sellers the total sum of Twenty-Two Million Five Hundred Thousand Dollars ($22,500,000.00; the "Purchase Price"). Of this amount, Fifteen Million Seven Hundred Fifty Thousand Dollars ($15,750,000.00) will be paid in cash at Closing. From the cash portion of the Purchase Price, each Seller shall satisfy all liabilities associated with its business, except as provided in section 6(e) regarding trade payables. The balance of the Purchase Price of Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00) shall be owner-financed through a secured subordinate promissory note, amortized over fifteen (15) years, with interest at five and one-half percent (5.5%) per annum, with monthly payments of principal and interest. The note shall be secured by a second lien or mortgage on the Property. Such lien or mortgage shall be subordinated to the lien or mortgage of Buyer's lender, which shall secure indebtedness and lines of credit in a cumulative principal amount of no more than Eighteen Million Dollars ($18,000,000.00).

(Rec. Doc. 14-1, p. 1–2 ¶ 2). The June 2 LOI also "supersede[d] any and all prior negotiations and agreements." *Id.* at p. 6 ¶ 15. Further, the June 2 LOI provided that the "Agreement may only be amended by written instrument executed by Buyer and Sellers." *Id.*

Around July 18, 2016, Plaintiff informed Deese that his long-time lending bank, FNBC, demanded that the terms of the deal be restructured before FNBC would finance the acquisition. (Rec. Doc. 75, p. 1). On July 19, 2016, Plaintiff sent Deese an email proposing to amend the June 2 LOI. The email provided:

> All,
>
> The bank's CEO will not enforce the below.
> In a last ditch attempt to save the deal, the office and I came up
> with the following. Please let me know if it's acceptable. I'm available to discuss at [omitted].
>
> 1. Cash at closing 10.75 MM;
>
> 2. 5MM paid 1 MM per year on every anniversary of the sale [if] EBITDA for that year (and cumulatively for years 2-5) exceeds 3MM per year; and
>
> 3. For any year that the EBITDA is lower than 3MM (and cumulatively for years 2-15), 1/15 of the principal and all interest due that year are extinguished.
>
> I am told the bank's CEO will recommend this model tomorrow if agreed to by the Sellers today.

. . .

W. Christopher Beary

(Rec. Doc. 54-1, p. 1). Clauses two and three of the above email are a point of contention between the parties and collectively referred to as the "Cumulative EBITDA Provisions." Deese then conferred with his broker, Dara Shareef, and his lawyer, Trevor Brewer, regarding Plaintiff's proposed amendments. (Rec. Doc. 75, pp. 4–5). Thereafter, on July 20, 2016, Brewer forwarded an email from Deese to Plaintiff. Brewer's email stated: "Please see the following counter-proposal from David. Advise if you wish to discuss this sometime today." (Rec. Doc. 14-3, p. 1).

The email from Deese provided, in relevant part:

All here is my counter-offer in an attempt to save the deal.

I would be willing to take 12 Million at close.

I would be willing to accept 4 million over 5 years provided payments are made monthly and are guaranteed by bank LOC and are not contingent by new company having cash to pay.

The balance 6+ million to be paid under same terms however the term is reduced to 10 Years. This is a company debt and the bank should have no say so in this. Payments on this note also must be paid as a priority.

. . .

*Id.* at p. 2. Thereafter, on July 20, 2016, Plaintiff responded to the above provisions by typing his remarks in all capital letters. Plaintiff's comments were as follows:

All here is my counter-offer in an attempt to save the deal.

I would be willing to take 12 Million at close.

I CAN ATTEMPT TO GET THEM TO AGREE TO 11.75MM WITH 4MM OVER THE FIRST 4 YEARS BUT IT MUST BE ANNUALLY AND AT THE 3MM EBITDA THRESHOLD. THE PAYMENTS WILL BE GUARANTEED BY THE BANK/LOAN COMMITMENT.

I would be willing to accept 4 million over 5 years provided payments are made monthly and are guaranteed by bank LOC and are not contingent by new company

having cash to pay. The balance 6+ million to be paid under same terms however the term is reduced to 10. I CANNOT AGREE TO REDUCE THE TERM TO 10 YEARS.

Years. This is a company debt and the bank should have no say so in this. Payments on this note also must be paid as a priority. I would [l]ike to have language that protects me and allows me [s]wift action or even Chris loses ownership or something to that effect if [t]his becomes past due. Basically if he gets behind on payments I have the right to exchange past due payments for stock or something to that effect. THE BANK IS REQUIRING THE 3MM EBITDA THRESHOLD FOR CONTINUING DEBT PAYMENTS.

. . .

(Rec. Doc. 14-4, p. 2–3). Thereafter, still on July 20, 2016, Brewer replied to Plaintiff's email stating:

I spoke with David before he went into his first game of the day. He is willing to meet you on all of the terms you outlined below provided that you can agree that David's profit sharing will continue for Years 6-10, and the employees will profit share for years 11-15. David noted that this was the original deal point, and that it should not impact the bank's security. Since David's willing to give on all other areas, he'd like you to meet him on this one.

(Rec. Doc. 14-5, p. 1). To that email, Plaintiff responded, "Trevor, I agree. I will tell the bank and advise. . . ." (Rec. Doc. 14-6, p. 1). Later that day on July 20, 2016, Plaintiff sent the following email, in relevant part, to Brewer and Deese:

David and Trevor,

My senior bank officer has agreed and recommended the deal/loan change we agreed to of:

1. Cash at closing 11.75MM;

2. 4MM paid 1MM per year on every anniversary of the sale [if] EBITDA for that year (and cumulatively for years 2-4) exceeds 3MM per year, and

3. For any year that the EBITDA is lower than 3MM (and cumulatively for years 2-15), 1/15 of the principal and all interest due that year are extinguished.

The bank Board will be will be able to meet next Wed for final approval. The CEO is waiting to see the final application now and we have indications he will recommend (he just wants to see it all in writing).

The bank is hiring counsel in Orlando to start working on the closing and will advise soon of its choice so we can get going. I shared Trevor's recommendations on counsel.

. . .

(Rec. Doc. 67-10, p. 2).  Deese replied with the following email, in relevant part:

> Chris the cash for the purchase of my business is for its valuation today.  Not for what profits it will or will it make (sic).  If I'm [r]eading this correctly I may not get the 4 mil.

> Below doesn't mention the 15 year note but there should be no stipulation on that payment either.  Again the 22 mil is a payments (sic) for fair value of my business and not for what profits it may or may not make moving forward.  The 33% is designed for future profits.

> It sounds like we may be going backwards.  I also wrote that I would agree to the hold back of 4 mil contingent payments would be paid monthly and secured by the LOC Paid by the bank through the LOC.

> . . .

(Rec. Doc. 67-11, p. 1).

The parties disagree as to whether the communications described above and herein created a binding contract between the parties to sell the Quinco Companies.  Defendants contend that nothing in the above email exchange between July 19, 2016 and July 20, 2016 evidences an offer and acceptance of a term requiring that in order for the $4 million to be paid, EBITDA cumulatively for years 2-4 must exceed $3 million per year.[16]  Therefore, Defendants' position is that because these EBITDA provisions were never expressly agreed to, the parties never created a valid and enforceable contract for the sale of the assets of the Quinco Companies.  On the other hand, Plaintiff argues that because neither Deese nor Brewer mentions the Cumulative EBITDA Provisions in their responses/counteroffers, the Cumulative EBITDA Provisions are included in the final agreement between the parties.  Plaintiff argues that if an original term is not mentioned in later negotiations, it is assumed that the original term is accepted.  (Rec. Doc. 75).  Additionally and alternatively, Defendants

---

[16] Defendants also argue that it is highly questionable whether there was an offer and acceptance on the requirement that in order for the $6.75 million to be paid that EBITDA for that year and cumulatively for years 2-15 must exceed $3 million per year.  (Rec. Doc. 67-1, pp. 5–7).

argue that regardless of the Cumulative EBITDA Provisions issue, Deese's attorney, Trevor Brewer, lacked both actual and apparent authority to enter into any agreement on behalf of Deese.

### B.  Legal Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255).

Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

### C.  Law and Analysis

In this Court's previous Order regarding the binding nature of the agreement between the parties, the Court ruled that issues of material fact existed that barred the Court from ruling that the LOI entered into was non-binding.  Defendants now bring to the instant motion seeking a ruling dismissing the breach of contract claims brought by Plaintiff on grounds different from those argued in Defendants' previous motion for summary judgment.  (Rec. Doc. 20).

As an initial note, Defendants' motion for summary judgment is vague in stating the relief that it seeks. Plaintiff's Third Amended Complaint alleges that Defendants breached the parties' agreement in the following ways:

(a) they failed to fully cooperate with [Plaintiff] and his agents during the Due Diligence Period as required by Section 4 of the Letter of Intent;

(b) they failed to provide full access to their contracts, books and records during the Due Diligence Period as required by Section 4 of the Letter of Intent;

(c) they failed to negotiate the closing documents in good faith as required by section 12 of the Letter of Intent;

(d) they repudiated the July 20, 2016 amendments to the Letter of Intent; and

(e) they refused to close the transaction in accordance with the Letter of Intent, as amended.

(Rec. Doc. 54, p. 26). Defendants only propose that the Court dismiss Plaintiff's breach of contract claims, but as shown above, Plaintiff's breach of contract claim rests on several different grounds. The Court interprets Defendants' instant motion for partial summary judgment as seeking to dismiss Plaintiff's breach of contract claim only as it pertains to part (e)—"[Defendants] refused to close the transaction in accordance with the Letter of Intent, as amended." In this Court's previous Order and Reasons (Rec. Doc. 39), the Court discussed New York's categorization of binding preliminary agreements into two distinct types. *See* (Rec. Doc. 39, p. 10) (citing *Teachers Ins. & Annuity Association of America v. Tribune*, 670 F.Supp. 491, 494 (S.D.N.Y. 1987)). The first type of binding agreement occurs when the parties have reached an agreement on all matters that require negotiation. *Id.* The second type expresses the parties' mutual commitment to a contract on agreed major terms while recognizing the existence of open terms that remain to be negotiated. *Id.*

Under New York law, a party bringing a breach of contract claim has the burden of proof to show by a preponderance of the evidence that a valid and enforceable contract having a legal inception is binding upon the defendant. *Fleming v. Ponziani*, 247 N.E.2d 114 (1969). The threshold questions

concerning whether the parties' negotiations resulted in a binding contract are (1) assent (did the parties manifest their mutual intent to be bound by the terms of the contract?); (2) definiteness (do the agreed upon contract terms set forth the intention of the parties with reasonable certainty so that their agreement can be enforced by a court?); and (3) consideration (did each party give something of value in the bargained for exchange?). 28 N.Y. Prac., Contract Law § 2.1 (2017). "Where there is no dispute concerning the communications between the parties or other circumstances surrounding contract formation, the court may determine, as a matter of law, whether the parties entered into a binding agreement." *Id.* (citing *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008)). "Where the finding of whether there was an intent to contract is dependent upon evidence from which inferences are drawn from the facts, a question of fact exists." *Id.* (citing *Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 361 N.E.2d 999 (1977)). "A dispute as to whether such mutual assent exists is usually determined by the trier of fact." *Id.* (citing *Bazak Intern. Corp. v. Tarrant Appareal Group*, 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005)).

> Where there is no final document on which to rely, the controlling factor in determining whether parties are bound by an agreement is whether a court has evidence of the parties' intent to be bound. *Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007); *Winston*, 777 F.2d at 80. Because a court cannot decipher the "secret or subjective intent" of the parties, "it is the objective intent . . . that controls." *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997); *accord* 22 N.Y. Jur.2d, Contracts § 29 (2013) ("In the formation of a contract, only the overt acts of the parties may be considered in determining mutual assent.")).

*Renaissance Search Partners v. Renaissance Ltd., L.L.C.*, No. 12-CV-05638, 2013 WL 6839039, at *3 (S.D.N.Y. Oct. 15, 2013). Here, there is no final document on which to rely. Therefore, the Court must look to the objective intents of the parties to determine whether an intent to be bound was present between the parties.

Plaintiff argues that Deese agreed to the Cumulative EBITDA Provisions because these provisions were never mentioned again until Plaintiff's final summary of the terms between the parties. (Rec. Doc. 75, p. 6). However, in response to Plaintiff's summary of the terms, Deese expresses his

dissatisfaction with Plaintiff's terms. Deese notes, "It sounds like we may be going backwards." (Rec. Doc. 67-11, p. 1). Deese also rehashes the terms that he requested be included in the agreement. Deese's email also states, "Reading this correctly I may not get the 4 mil. . ." and "Below doesn't mention the 15 year note but there should be no stipulation on that payment either". *Id.*

Plaintiff's position seems to be that his July 20, 2016 email stating, "I agree. I will tell the bank and advise" to be the acceptance to Deese's offer, and thus, completing the agreement to sell the Quinco Companies. (Rec. Doc. 67-9, p. 1). The Court disagrees. Plaintiff's response is not an objective intent to be bound, but rather a manifestation of the intent that the deal was close to being done once FNBC gave Plaintiff the "ok." Both parties knew that whatever the parties agreed to would be subject to Plaintiff's lender, FNBC, agreeing to the terms. In fact, the reason the terms had to be restructured originally was because of FNBC's dissatisfaction with such terms. Both parties were cognizant that Plaintiff would not agree to buy the Quinco Companies without FNBC's financial backing, and therefore, without FNBC's consent to certain terms.

In *Different Drummer LLC v. National Urban League, Inc.*, the court found that an email, stating "[L]et's move the ball forward," to be an inferred assent to the terms of the contract at issue. No. 11-CV-4982, 2012 WL 406907, at * 5 (S.D.N.Y. Feb. 7, 2012). Here, Deese clearly expressed to Plaintiff that he did not wish to proceed on Plaintiff's terms when stating, "It sounds like we may be going backwards." (Rec. Doc. 67-11, p. 1).[17]

A series of emails will not support a finding of a binding contract when the emails themselves are inconsistent as to the terms of an agreement being discussed or contradict other evidence presented by a party. 28 N.Y. Prac., Contract Law § 2:13 (2017) (citing *Friedman v. Schwartz*, No. 08-CV-2801,

---

[17] Plaintiff argues that Deese consented to the Cumulative EBITDA Provisions because those terms were not referenced in the later exchange of emails, but only in the Plaintiff's July 19, 2016 email seeking to change the terms of the June 2 LOI. Plaintiff proposes, without a citation to law, "[i]f an original term isn't mentioned in later negotiations, it is assumed that the original term is accepted." (Rec. Doc. 75, p. 6). Deese did disagree to the Cumulative EBITDA Provisions in his subsequent July 20, 2016 email expressing, "If I'm [r]eading this correctly I may not get the 4 mil." (Rec. Doc. 67-11, p. 1). The Court is not convinced by Plaintiff's argument.

2010 WL 3937304 (E.D.N.Y. 2010)). The emails also may indicate there is no contract because the parties did not wish to be bound until they executed a definitive agreement. *Id.* (citing *Cabrera Capital Markets, LLC v. Further Lane Securities, L.P.*, No. 12-CIV-2898, 2013 WL 5462373 (S.D.N.Y. 2013)).

Applying the applicable law outlined above, the Court cannot find that the parties ever agreed to the necessary terms under which the Quinco Companies would be sold to Plaintiff. The emails exchanged between parties, *see supra*, objectively show that the parties never agreed upon the necessary terms to sell the Quinco Companies.

However, besides evidencing a contract, emails can show that the parties entered into a binding preliminary agreement. *Id.* (citing *Renaissance Search Partners*, at *4). As found in this Court's previous Order and Reasons, New York law recognizes that parties may enter into a preliminary agreement with binding force that "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." (Rec. Doc. 39, p. 10) (citing *Teachers*, 670 F.Supp. at 498). Such a description falls squarely within the confines of this case.

This Court grants in part and denies in part Defendants' Motion for Summary Judgment (Rec. Doc. 67). The Court dismisses Plaintiff's breach of contract claim seeking damages only on the ground that "[Defendants] refused to close the transaction in accordance with the Letter of Intent, as amended." (Rec. Doc. 54, p. 26). Plaintiff's remaining grounds for a breach of contract claim remain and Plaintiff may seek damages based on these grounds. *Id.*; *see also supra* p. 21.[18]

### V. Defendants' Motion to Disqualify Jeffrey L. Oakes (Rec. Doc. 68)

---

[18] The Court finds it unnecessary to address the issue of whether Deese's lawyer, Trevor Brewer, had the actual or apparent authority to bind Defendants to any sale of the assets of the Quinco Companies. However, the Court finds that this issue inherently includes a genuine issue of material fact that precludes summary judgment.

Defendants bring the instant motion seeking to disqualify Plaintiff's counsel, Jeffrey Oakes, from serving as counsel at the trial of this matter. According to Fifth Circuit precedent, "[m]otions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992) (citing *In re Dresser Indus.*, 972 F.2d 540, 543 (5th Cir. 1992)). The United States District Court for the Eastern District of Louisiana has adopted the Rules of Professional Conduct of the Louisiana State Bar Association. LR 83.2.3. Louisiana Rule of Professional Conduct 3.7 addresses the scenario in which a lawyer seeking to act as advocate at trial may be called as a necessary witness. The Rule provides, in relevant part:

> (a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness except where:
>
> > (1) The testimony relates to an uncontested issue;
> >
> > (2) The testimony relates to the nature and value of legal services rendered in the case; or
> >
> > (3) Disqualification of the lawyer would work substantial hardship on the client.

Louisiana Rule of Professional Conduct 3.7.

The parties agree that Mr. Oakes will be a necessary fact witness at trial. (Rec. Doc. 74, p. 1) ("Plaintiff acknowledges that Oakes was heavily involved in the transaction at issue in this litigation and that Oakes is likely to be called as a witness on contested matters."). Therefore, the provisions of Rule 3.7 undoubtedly come into play. Plaintiff has made clear that Mr. Oakes will not be speaking to the Court, or any witnesses throughout the trial. Further, Plaintiff contends that Mr. Oakes will not be "urging anyone to action on Plaintiff's behalf." (Rec. Doc. 74, p. 2). For these reasons, Plaintiff argues that Mr. Oakes cannot be considered as an "advocate" as contemplated in Rule 3.7.

Rather than have Mr. Oakes act as "advocate" at trial, Plaintiff requests that Mr. Oakes be allowed to "sit at counsel's table, have private communication with . . . trial counsel as needed, and to

generally assist trial counsel in the conduct of the trial on Plaintiff's behalf." (Rec. Doc. 74, p. 3). Plaintiff essentially argues that Rule 3.7 is inapplicable because that rule only applies to lawyers acting in the capacity of "advocate" during trial. In the alternative, Plaintiff argues that if this Court considers Mr. Oakes to be an "advocate" under Rule 3.7, he should still be allowed to sit at counsels' table under the Rule 3.7(a)(3) exception. In support of this alternative argument, Plaintiff argues that the third exception under Rule 3.7 applies because preventing Mr. Oakes from sitting at counsels' table and conferring with co-counsel during the course of the trial would cause a substantial hardship on the Plaintiff.

The Court notes that because this matter is now a bench trial following the dismissal of Defendants' Counterclaim and jury demand, the concern of jury confusion is moot. Rather, the main concern of the Court at this juncture is Mr. Oakes being sequestered as a witness. As a general rule, parties have the right to request that the Court order witnesses be excluded from the courtroom so that they cannot hear other witnesses' testimony. Fed. R. Evid. 615. Rule 615 states that at the request of a party, "the court must order witnesses excluded so that they cannot hear the other witnesses' testimony"; however, the rule "does not authorize excluding . . . (c) a person whose presence a party shows to be essential to presenting the party's claim or defense." "Whether or not a witness is essential, and hence should be exempt from Rule 615 exclusion, is a matter soundly within the discretion of the trial court." *Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1209 (5th Cir. 1993).

Accordingly, Defendants have the right to have Mr. Oakes sequestered outside of the courtroom if they so choose. Mr. Oakes is a fact witness. Mr. Oakes is not a party. The Court finds no reason to treat Mr. Oakes any differently than an ordinary fact witness. The Court notes its own institutional interest in maintaining just and fair trials. Extending special treatment to Mr. Oakes because he has worked extensively on this matter is unwarranted. Moreover, Plaintiff has retained the services of excellent counsel—Kyle Schonekas—to act as lead trial counsel. Mr. Schonekas is well-equipped and more than capable of handling the trial of this matter. Finally, the Court notes that

Plaintiff himself is a lawyer who, as a party, will be allowed to sit at counsels' table. Plaintiff is perhaps the most knowledgeable individual regarding the facts and legal arguments pertinent to his own case-in-chief. For these reasons, Defendants' **Motion to Disqualify Jeffrey L. Oakes (Rec. Doc. 68)** is **GRANTED.**

## VI. Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims Under the Florida Deceptive and Unfair Trade Practices Act (Rec. Doc. 70)

The final motion to address is Defendants' motion seeking to dismiss Plaintiff's claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201 *et seq.* (Rec. Doc. 70). Defendants contend that Plaintiff cannot carry his burden of proving "actual damages" as required under FDUTPA.

### A. Legal Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255).

Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations

and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

### B. Law and Analysis

To establish a claim under FDUTPA, a plaintiff must prove three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Hetrick v. Ideal Image Dev. Corp.,* 758 F. Supp. 2d 1220, 1229 (M.D. Fla. 2010); *Henderson v. Demars*, No. 11-80589-Civ., 2013 WL 1176251, at *16 (S.D. Fla. Mar. 20, 2013). The parties dispute the final element—whether Plaintiff suffered "actual damages" as contemplated under FDUTPA.

In response to interrogatories asking what damages Plaintiff seeks to recover under his FDUTPA claim, Plaintiff responds with the following damages: attorney fees paid to the bank's attorneys, the fees paid to Wilson LaGraize, the fees paid to Daryl Schouest, loss of revenue from the time that Jeffrey Oakes spent on the Quinco transaction, travel expenses to and from Orlando, appraisal fees, attorney fees expended in this litigation, and a loss of future income. (Rec. Doc. 70-1, p. 6).

Defendants argue that FDUTPA limits "actual damages" to the "difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered. . . ." *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999), *aff'd sub nom. Eclipse Med., Inc. v. Am. Hydro-Surgical*, 235 F.3d 1344 (11th Cir. 2000). Defendants allege that the transaction in this case was the "acquisition of the assets of the Quinco Corporations." (Rec. Doc. 70-1, p. 6). Defendants note that Plaintiff never completed the transaction for the acquisition of the assets of the Quinco Companies, so he could not have incurred any damages as a result of "the difference in the market value of the product or the service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *Id.* at p. 6 n. 6.

The Court agrees with Defendants.  Plaintiff correctly points out that the 2001 amendments to FDUTPA expanded the scope of the statute to allow any "person" who has suffered a loss as a result of a violation of FDUTPA to recover "actual damages" rather than just "consumer[s]."  *Bailey v. St. Louis*, 196 So.3d 375, 382 (Fla. App. 2d Dist. 2016) (holding, "[E]ffective July 1, 2001, the legislature amended section 501.211(2), Florida Statutes (2001), by inserting the word "person" in place of the word "consumer" . . . "the Florida Legislature's replacement of the word consumer with the word person, demonstrates an intent to allow a broader base of complainants . . . to seek damages.").  "The 2001 amendment has been interpreted to broaden the class of plaintiffs that may bring an FDUTPA claim for damages."  *See Niles Audio Corp. v. OEM Systems Co.*, 174 F. Supp. 2d 1315, 1319 (S.D. Fla. Oct. 30, 2001). While the Court agrees that this change affords Plaintiff the right to bring a cause of action as a "person" rather than a "consumer," Plaintiff has not shown he suffered "actual damages" in accordance with FDUTPA.

> Section 501.212(3), Florida Statutes (2009), further provides that the act does not apply to "a claim for damage to property other than the property that is the subject of the consumer transaction."  Accordingly, under FDUTPA, the term "actual damages" does not include special or consequential damages.  *See Smith v. 2001 S. Dixie Highway, Inc.*, 872 So.2d 992, 994 (Fla. 4th Dist. Ct. App. 2004); *Orkin Exterminating Co. v. DelGuidice*, 790 So.2d 1158, 1162 (Fla. 5th Dist. Ct. App. 2001); *Urling*, 468 So.2d at 454; *see also Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So.2d 311 (Fla. 4th Dist. Ct. App. 1998) (where plaintiff alleged violation of FDUTPA in the purchase of his car, consequential damages in the form of car loan payments were not recoverable).

*Rodriguez v. Recovery Performance & Marine, LLC*, 38 So.3d 178, 180 (Fla. 3rd Dist. Ct. App. May 19, 2010).

Accordingly, FDUTPA does not afford Plaintiff a cause of action through which to recover his proposed damages. Because the transaction contemplated by the parties never occurred, Plaintiff is unable to show a "difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered" as required

under the "actual damages" requirement of FDUTPA. Accordingly, the Court must grant Defendants' motion for summary judgment seeking to dismiss Plaintiff's FDUTPA claim.[19]

### VII. Conclusion

For the reasons set forth above, Plaintiff's **Motion to Dismiss Counterclaim (Rec. Doc. 60)** is granted. Defendants' **Motion for Partial Summary Judgment (Rec. Doc. 67)** seeking to dismiss Plaintiff's breach of contract claim is granted in part and denied in part. Defendants' **Motion to Disqualify Jeffrey L. Oakes (Rec. Doc. 68)** is granted. Defendants' **Motion for Partial Summary Judgment on Plaintiff's Claims under the Florida Deceptive and Unfair Trade Practices Act** is granted.

Accordingly;

IT IS ORDERED that Plaintiff's **Motion to Dismiss Counterclaim (Rec. Doc. 60)** is **GRANTED**. Defendants' counterclaim for violation of Florida's Security of Communications Act, Fla. Stat. § 934.01 *et seq.*, is **DISMISSED WITH PREJUDICE**;

IT IS FURTHER ORDERED that Defendants' **Motion for Partial Summary Judgment (Rec. Doc. 67)** is **GRANTED in part** and **DENIED in part.** Plaintiff's breach of contract claim is **DISMISSED WITH PREJUDICE** only to the extent that it seeks damages for Defendants' refusal to close the transaction in accordance with the Letter of Intent, as amended;

IT IS FURTHER ORDERED that Defendants' **Motion to Disqualify Jeffrey L. Oakes (Rec. Doc. 68)** is **GRANTED;**

IT IS FURTHER ORDERED that Defendants' **Motion for Partial Summary Judgment on Plaintiff's Claims Under the Florida Deceptive and Unfair Trade Practices Act (Rec. Doc. 70)** is

---

[19] The Court also notes its concerns that Plaintiff's recoverable damages under its remaining breach of contract claim may be duplicative of those damages sought under his FDUTPA claim.

**GRANTED**.  Plaintiff's **Florida Deceptive and Unfair Trade Practices Act** claim is **DISMISSED WITH PREJUDICE;**

IT IS FURTHER ORDERED that, considering Defendants' jury demand was based on their now dismissed Counterclaim, this matter will be tried as a bench trial.

July 12, 2018

JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE